in this case, which is Michael Johnson v. Pride Industries, Incorporated. And first up is Mr. Bifulco. That's Bifulco. Thank you very much, Judge Dennis. I may please the court. Appellant Michael Johnson, the only African-American carpenter in a shop operated by Pride, experienced 14 months of harassment that included consistent use of racial slurs around and against him, such as the Spanish version of the n-word and the Spanish version of boy, damage to his personal property, attempts to hinder his job advancement, and perceived threats on his safety and his life. Pride failed to stop this harassment despite Johnson's repeated complaints, and as a result, Johnson was forced to resign. The district court below granted summary judgment to Pride on Johnson's claims for hostile work environment, failure to promote, constructive discharge, and retaliation. This analysis and the ultimate ruling of the district court were in error. Johnson provided sufficient evidence that a jury could find in his favor on all four claims. The district court improperly weighed the evidence, failed to consider the totality of the circumstances, and viewed this evidence in the light most favorable to the non-moving Johnson. At worst, the record is replete with multiple material disputes of fact, making summary judgment inappropriate. We respectfully ask that this court reverse and remand the order of the district court. Your honors, I'd like to discuss three aspects of this case with you today. The evidence of harassment that Johnson experienced, the district court's error of law on the failure to promote claim, and Johnson's exhaustion of his administrative remedies as it relates to his constructive discharge and retaliation claims. First, the district court held that Johnson could not demonstrate a prima facie claim for hostile work environment. Now, this is a burden that this court has described as minimal and not onerous. That was Judge Elrod writing on behalf of the court in Reed versus Neopost USA, Incorporated, 701 F3, 434 F439, 2012. The district court did not consider the evidence given the totality of the circumstances which this court's president requires in the light most favorable to Johnson, which is the standard for summary judgment. First, as it relates to the racial slurs in this case, there are two slurs at issue. The first is the N-word and the Spanish version of the N-word. Pride and Mr. Johnson do not dispute that Johnson provided evidence of at least two instances of a supervisor using the Spanish version of the N-word in reference to Johnson. I apologize, Judge Dennis. I didn't hear your question. It was not Johnson's supervisor, was it? That's correct, Judge Dennis. It was a supervisor at Pride, but it was not Johnson's direct supervisor. The district court, however, found that this was a case of a single slur. That is an error and an error in not interpreting the evidence in favor of Johnson. And in addition to these specific instances, Johnson provided evidence of the supervisor's repeated use of slurs in the workspace. This included Johnson testifying that he heard it multiple times, Johnson testifying that others told him that they had heard it multiple times, and most critically, the affidavit of a Ray Yanez stating that the supervisor used it multiple instances and used it against Johnson. Is it your position that what you've just recited, this evidence showing use of the Spanish N-word, would that be on its own sufficient to reverse the summary judgment? Or do we also have to reach these other issues in your view about what happened to his vehicle and the paperwork found in the supervisor's desk and those other issues? Judge Costa, we would submit that the evidence solely of the use of the N-word repeatedly in the workspace and in reference to Johnson is enough to create a material dispute of fact that this case should not have been decided in summary judgment. But as you point out, that's not the only evidence of racial animus, and it's not the only evidence of the use of racial slurs in this case. Briefly on my point on Ray Yanez, this is another employee stating that he heard the slurs. Contrary to the district court who wrote that this entire case was based on Johnson's, say so, that's that record on appeal 1393, the evidence of Ray Yanez demonstrates that multiple employees knew that slurs were being used. The second slur, the word mijo, or the Spanish word for boy, the district court found that this word was not objectively offensive. To be clear, the district court found that the use of the word mijo only to the only African American employee was not objectively offensive. That flies in the face of Supreme Court precedent. The Supreme Court has held in Ashby Tyson Food that the use of the word boy can demonstrate racial animus given context, historical usage, and local custom. The district court, however, considered this evidence in isolation without taking into account the totality of the circumstances, which is that even the supervisor would not refer to Johnson by his name. He would only refer to him as mijo. In addition to these slurs, Johnson provided evidence to the district court of other acts by the supervisor that were motivated based on Johnson's race. These include Johnson being singled out at lunch for working through lunch when he was approved to do so, the supervisor hiding his promotional paperwork in his desk, the supervisor sabotaging equipment brought to Johnson, and the supervisor monitoring Johnson while he worked or ordering other workers to monitor him. If you review the district court's opinion, the district court makes no reference to these acts. It makes no reference to them in its statement of facts. It makes no reference to them in its analysis. The best that we can determine is that the district court, when it wrote that Johnson alleges discrimination throughout the record, but it is nothing more than ethereal harassment, was referring to this conduct. However, the district court stated that this was only a case based on a single racial slur, which cast doubt on whether the court not only correctly considered this evidence, but considered this evidence at all. In addition, taking all of these acts into account, they color the entire situation at pride. We would submit that it is in this context that we must consider the acts of the screw being driven into his tire, his truck being vandalized, and most critically, a loaded magazine clip being left on the bumper of Johnson's truck. Critically, your honors, I'd like to point out the fact that as to the vandalism of his truck, Johnson and pride did not raise this evidence below. The district court, however, reviewed the entirety of the record and wrote and discussed this in its analysis. We would the entire record, both under its precedent and under the acts that occurred here below. At bottom, pride never provided any evidence that it did anything to stop this racial harassment. In fact, the point that pride hammers in their brief is that the supervisor was removed six months before Johnson resigned. You must note, however, that at record 194, it demonstrates that Johnson's EEOC charge in March 2019, six months before he resigned, and we would submit taking all inferences in favor of Johnson, that it was only when this formal charge was sent to pride that it took any action whatsoever, and that was to remove the supervisor from the shop. Turning now to the second point that I'd like to highlight for the court, this concerns Johnson's failure to promote plans. The district court held that Johnson could not demonstrate a prima facie case of failure to promote because he could not provide evidence that pride had promoted individuals with equal qualifications to Johnson. This was an error of law. As this court has recognized repeatedly in case law on the last element of a failure to promote claim, an individual can prove that claim if they demonstrate that the employer promoted someone who does not share the same protected characteristic as the plaintiff. Here, there is evidence that the individuals who were promoted were Hispanic. Johnson, again, the only African American employee. Let's assume you made out a prima facie case and that was a mistake. How do you get a fact issue on the ultimate question on this claim when my understanding is the company says, look, we promoted people who had supervisory experience, experience managing people with your clients. He'd run his own business. You know, maybe that in some ways is a much better experience, but it is different. I'm sorry, judge, not that they're not managing people. So how do you, how do you get free tax? I'm sorry. No, and understanding your question is a question of pretext as it relates to if the court considers the prima facie case, your honor, we would submit that there's a material dispute of fact here. Johnson submitted evidence that he had supervisory experience in the form of owning his own business pride evidence. And the only evidence they have is a statement from a HR person saying that these individuals had supervisory experience at pride. And that supervisory experience was not for in the shop, in the carpentry shop, it was a different form of supervisory experience. Additionally, your honor, there is no grappling with the fact that Johnson has provided evidence of his, uh, his supervisory experience. And that we would submit is a, at least fact issue and material fact issue as to pretext on that point, judge Costa judges. I'd like to point out that the district court here did not actually rule on the McDonald Douglas framework. We've submitted that there should be a reverse and remand as to those three claims that are subject to it for the district court to rule in the first instance. However, this court is allowed to consider that evidence. And we would say that there has been a fact issue created. And finally, your honors, it is our position that Johnson exhausted his administrative remedies as it I see that my time turned out. May I just finish my point there? Yes. Thank you, your honor. On that point, we would say that both the constructive discharge claim and the retaliation claim are subject to this court's exception in Gupta. Thank you, your honor. Thank you. Next is Gail Coleman. You have five minutes. May it please the court Gail Coleman for the equal employment opportunity commission. I would like to address the constructive discharge and Johnson's failure to file a new charge in group service court held that the court may consider retaliation. Let me ask you at the outset about Gupta and exhaustion. My understanding is he's bringing, at least in the supplemental letter that appointed counsel filed made pretty clear. He's bringing section 1981 claims exclusively, not title seven. And I didn't think there's an exhaustion requirement for section 1981. So I guess my question is, does exhaustion even matter anymore? Well, you're correct. There is not an exhaustion requirement for section 1981. I would not like on behalf of the appellant to say that he is abandoning his title seven claim. So to the extent he is continuing to pursue a title seven claim, um, whether he filed a charge does continue to be relevant. Okay. Do you agree for 1981 Gupta exhaustion irrelevant? As far as I know, I'm not an expert in section 1981, but as far as I know, that would be right. Um, Gupta understood that retaliation for the filing of a charge only occurs because the charge was filed. Therefore it is reasonably related to the charge, regardless of the content of that underlying charge. The district court here said that Gupta applied because the constructive discharge sent stemmed from the same retaliation that was alleged in the charge, but it would have applied anyway. So that observation did not really matter here. The district court held the Gupta, uh, that the reasoning of Simmons Meyers was inapplicable because it understood Johnson to be alleging only retaliatory constructive discharge. And the EEOC's brief was based on that understanding. But even if Johnson is also alleging a discriminatory construct, constructive discharge, Gupta still applies. The only published opinion regarding dual claims for the same adverse employment actions is Scott versus University of Mississippi, which was cited in Simmons Meyers. In that case, the district court allowed a jury to hear testimony about the retaliation claim, but not about the discrimination claim. This court affirmed, meaning the retaliation claim survived. Although the court upheld the decision to exclude evidence of the discrimination claim, it did so on a very narrow ground. In that claim was intricately connected to the previous discrimination claim in a charge. She did not argue that it was intimately connected to the retaliation claim, but in fact, it's impossible to disentangle a discrimination claim from a retaliation claim about the same adverse employment action. Let me ask, let me go back to my question and I'll, I take it. You said you don't, you're What would Title VII get the plaintiff that 1981 wouldn't? In other words, if there is this exhaustion issue with Title VII, why go after that? Are there better remedies under Title VII? What would the advantage be of going through Title VII? I'm sorry, but I don't have an answer for you. It's just that I'm not familiar with Section 1981. I'd like to point out that discrimination would be simply an alternative explanation for what is alleged to be an adverse action in retaliation for filing the charge. So if the EEOC is investigating the retaliation for filing a charge, it would necessarily investigate both, both allegations. That's the only way to rule in or rule out whether something happened because of retaliation. And for that reason, in our experience as the enforcement agency, an additional filing would serve no purpose. The opinion, the unpublished opinion subsequent to Scott versus University of Mississippi have applied Scott to exclude discrimination claims without taking into account either the very limited nature of the holding of Scott or the close relationship between the alternative discrimination claims and the and which even Scott allowed to proceed. So based on Gupta's language and logic, a minimum Johnson's retaliation claim should survive. And in the EEOC's view, neither claim should be dismissed. I see... Can you address the Morgan case? Yes. Morgan has no bearing on Gupta, and the reason is Morgan prohibits time-barred claims or conduct that occurred before a charge was filed. Retaliation for the filing of a charge only occurs after the charge is filed, and therefore there are no implications regarding the statute of limitations. The employee has already initiated the administrative process, and there is no attempt to gain the system. The purpose of a charge is to notify the EEOC, but the EEOC is always on the lookout for retaliation for the filing of a charge, and that is... Your time has expired. Okay. Thank you, Your Honor. Thank you. Ms. Burns, you have 20 minutes. Thank you, Judge Dennis. May it please the court. The Pride Industries is an AbilityOne contractor with a maintenance services contract at Fort Hill Military Base here in El Paso, Texas. An AbilityOne contractor is a contractor of the Javits-Swagger O'Day Act, and it's required as part of its contract to employ 75% of its direct workforce as disabled workers. Mr. Johnson was hired as a disabled worker with a diagnosis of post-traumatic stress syndrome, bipolar mood disorder, and paranoid and obsessive-compulsive personality traits. That's what qualified his employment. During the two and a half years of his employment, he received a promotion, he had favorable performance reviews, and his disabilities were accommodated with time off and a reduced work schedule, as you requested. During his employment, he received two disciplinary warnings, neither of which he complains about in this case. In fact, he concedes that both of them were proper based on his profanity, and in other words, where he intentionally destroyed his cell phone, or company's cell phone. In 2017, after he missed work and was tardy on a couple of days later, without an explanation, the assistant facilities manager, a woman named Sonia Bonham, about whom he has no complaints, called him in to discuss his attendance. During that meeting, he decided he was going to quit. He testified, and this is undisputed in the record, that he did not have advanced plans to quit. He decided at that moment that he did not want to work there anymore. He told his doctors at the VA that he quit because he was having problems with the shoulder, and he couldn't do urgency duties. That's in the record at page 1367, and he signed a resignation form in the record at 700, said he was quitting for medical reasons. Interlaced in this time frame is his claim that during 2016 and early 2017, a gentleman named Juan Palomares, who was not his supervisor, but a supervisor, made some comments that he considered to be racist and offensive. He also claims some other types of harassment that I'll talk about in a bit. Let's talk, I mean, there's a lot of different evidence people are pointing to on the harassment claim, but I think the main part of it is this use of the Spanish N-word. You cite some cases, and I don't blame you, I mean, you cited a number of unpublished cases saying that occasional use of that does not rise to severe or pervasive, and you cite what you can. I get that. I guess my question is, do you have any, what published authority, what's the best published authority from our circuit, presidential authority that supports the view that occasional or rare use of the N-word is not, doesn't create a fact issue on severe or pervasive? Well, I think that we've cited the Ramsey case, which is a published decision. It does not get into the specifics of what that racial conduct was, but it does say that sporadic or not significant incidents do not constitute, but certainly the unpublished opinions that we and more discussion of the facts, including the Brooks versus Firestone-Polymers case. Going back to Ramsey, and I'll have to read it again. I know that picked the general standard. Is that a case involving the N-word? It's unknown because the court, or the facts were not very well, I suspect, vetted. They're not described. It did involve a supervisor who disapproved of the plaintiff's relationship with African-Americans and disapproved that she was engaged or had a relationship with an African-American male and that she had a baby with that African-American male. All right. I mean, part of the reason I ask this and trying to figure out what's binding authority and what's not, Justice Kavanaugh, when he was on the DC circuit, has an opinion that says the N-word is such, is just the harshest word in the English language and our history and that really one use is enough to create a fact issue. I recognize we have unpublished authority that suggests otherwise, but it's really a question more for judges than for you. But it's interesting to me that all those cases continue to be unpublished. I don't know what that says, but again, that's not really something for you to answer. I take it you disagree with Judge Kavanaugh's view? I would because I think it's certainly a reprehensible term. It's not necessarily something that might meet all the standards that are required to establish a prima facie case of hostile environment. So I would disagree for that reason. And in this case, what the evidence was is that Mr. Johnson says he overheard Mr. Palamadas speaking Spanish to some other employees and he heard these words. He didn't know what the conversation was. He assumes it was about him. And then we have Mr. Yannis' affidavit, which is not very particular. He doesn't give us any details of the context or when or what. He simply says he heard it as well. But Mr. Johnson's own testimony was he heard it one to two times. And again, the only specific conversation he could remember was one where he overheard them talking about some type of cement project. So I think that in and of itself does not rise to the level. And then when you combine it with the other evidence, Mr. Johnson is asking this court to conclude that everything Mr. Palamadas did or said was somehow racial, even though the events, when you look at them, aren't racial at all. What he describes are not racial events. Well, if we know he uses this horrible epithet and then he, you have Johnson, as my understanding, is the only African American in that unit or at that work site, and this stuff keeps happening to him. It's not that it's absolutely a matter of race. The question is, could a jury piece all that together and conclude it's racially motivated? And it's just a question of what the jury could find, not what it has to find. Why couldn't a jury piece all the evidence and most especially the use of this N-word, corroborated use of the N-word in saying that his other actions against the plaintiff were racially motivated? Well, one reason is Mr. Johnson can't even identify Mr. Palamadas as committing these other acts. We have unsubstantiated allegations by Mr. Johnson. He's the only one that says a screw was drilled into my tire. He can't tell you who did it, when it happened, where it happened. What about the papers, the applications that were supposedly found in the desk? And that he does tag with that supervisor. He claims he was told by others that the papers were found. I point out that he did not argue that at the district court. That's not in his brief. That's not in his summary judgment response. And so we didn't identify or respond to it either. But he says he was told these applications were found on Mr. Palamadas. So it's hearsay at best. Why is it hearsay? Employees are a statement of an agent of a party opponent. That at least arguably comes in as an agent of the employer. If co-workers statements would often come in that way. But he's claiming they told him this. He's offering it for the truth of the matter asserted. I don't understand how that... Well, a hearsay exception means it can be offered for the truth of the matter. A statement by a party opponent, a statement by a party opponent's agent, it's a hearsay exception. So it can be offered for the truth of the matter. We don't know who said it, who told him he said it. But in any event, I would respectfully submit that it's hearsay. And it's not evidence. He didn't suffer harm. If, in fact, these applications were found on this desk, there's no showing of harm as a result of that. That's not an adverse employment action. And again, we're linking things that are not racial. I mean, going back to your question, if we have to assume that anytime somebody says something that's derogatory, then that colors every single thing they do, then an employer... You don't assume it does. The question is, could a jury circumstantially infer that? Well, I believe the district court got it right when it said these things are too far removed. They're too tenuous of a connection to reach that conclusion or for a jury to be able to reach that conclusion. I did want to address... Can I ask you quickly about the use of the Spanish N-word? It's my understanding that Palomar has allegedly used it twice in his presence, at least twice. Is that correct? Yes. Not to him, but he's... Mr. Johnson's speaker heard it. I was trying to be precise in my question. Right. Overheard it. He was... He used the term twice in his presence, allegedly. Allegedly. At least twice. It could be more than that, because he's also said there are other times he used the term. Correct? Well, Mr. Johnson's testimony is very specific. Mr. Johnson says Palomar has said it twice in his presence, and then said other times, too. He said he was told of other times. Okay. And then also used racial slurs outside of Johnson's presence, and we have an affidavit on that. We've used them not just... We've used them in casual reference in really statements that... Words that I'm not going to repeat here in the oral argument. Casually, which means not once or twice, but this is part of his vernacular. That's what the affidavit seems to say, right? That's what it seems to say. Correct. Okay. So this supervisor of the other unit was... This was known throughout their group that he was regularly using these very... The Spanish N-word and other words that are very inflammatory. Correct. I don't know that it was known. That individual did not go and complain about it, so I don't believe that it was known to the company. Casually in the office and in the workplace, not the office. They're in the field, so they're not in the office. Well, we found it like in Bow Brothers. It doesn't matter. You don't get less protection because you're in a field rather than in a high-rise in New York City. You get... Sure, sure. Everybody gets the right to protect it. So is that correct that he was regularly using these casually and frequently? All we know is what Mr. Yan has said in his affidavit. Okay. Now, you had another point you wanted to make. Well, I just wanted to address the Manos and the Mijo comments. They are not racist, and they do not... Mijo does not mean boy. Judge Montalvo, in his opinion, specifically talks about what the word Mijo means. You can determine the definition. I mean, the dictionary. It is not a word that means boy. There is a Spanish word that means boy. It is not Mijo. But doesn't it mean just literally my son? Yes. And my son can be thought of as derogatory or it can be affectionate, and that's why the context is so ash case about context for how these words are used. It could be a really dear term of affection, or it could be a derogatory dismissive term that is as well. Couldn't it? No, Your Honor. I do not believe. Maybe it's because I've lived in El Paso for 30 years, and Judge Montalvo knows what this word is. It is not a word that means boy. And there is no evidence in the record. Mr. Johnson, other than his testimony that, to me, it means boy, there's no objective evidence in the record from anyone or any other source that says that is a derogatory term or it can be used in a derogatory way. So I do take issue with that, and I do not... Do you think it's only endearing even though the worker called him only this and never used that name? Is that correct? That's what his testimony is. And yes, I think it could be, son, come do this, son, whatever the situation is. But it does not have a derogatory meaning, and it does not mean boy. Being called son repeatedly when you're a grown-up is not derogatory in a context of a workplace instead of your name? And isn't that a jury question? I don't believe it is because I think the objective evidence is that it does not have a derogatory meaning. Isn't the evidence that only the plaintiff was called that? That's what he claimed. Well, we have to, for summary judgment, we have to accept that. I understand that, but... Doesn't that also color this issue? If he's the only one being called it, he's also being called the N word, the Spanish N word. I mean, it's all taken under all the circumstances. I don't know where that leads us, but I do know we look at all the circumstances. All right. I appreciate that. I understand your point. I think the district court was correct, though, in concluding that those were not significant and substantial enough in their severity and their frequency to create it. And then the court did look at the other issues, and its conclusion was that all these other things, that there's no evidence that they even happened or that they're racial in nature, are really exactly what the Fifth Circuit has said in the Ramsey versus Henderson case and the Douglas versus USAA case, that these are conclusory allegations, speculation, and unsubstantiated allegations that do not satisfy his burden. With that, I wanted to move to the failure to promote claim. I think, quite frankly, the district court's reasoning was a little confusing, but I think the result was correct. And the result is, number one, our argument, and we did argue this contrary to the letter brief submitted by Mr. Johnson. We argued this on page 403 of the record, that Mr. Johnson did not establish a prima facie case because he didn't put on his qualifications at all. He didn't talk about how he was qualified for this position. But aside from that, we get to the fact that Pride offered through affidavit testimony that was unrefuted a legitimate non-discriminatory reason for why Mr. Johnson was not selected. And that's because it selected two candidates that had both inside and outside management and facilities management experience. There is nothing in the record, there's nothing in Mr. Johnson's summary judgment response that makes even an effort to refute that. So even if the district court did not make its decision based on that, it could have, and under Berkowitz v. Washington Mutual, this court's precedent, this court may affirm on any ground that is supported by the record, and both of those grounds, that Mr. Johnson did not establish qualifications under the prima facie stage, or that he did not rebut Pride's legitimate non-discriminatory reason, the court can affirm the dismissal of the failure to promote Cain on either of those. That turns us to the constructive discharge claim. And regardless of the exhaustion argument, I think if we just look at the merits of this argument, the individual that Mr. Johnson had issues with, Mr. Palamides, did not work with Mr. Johnson during the last six months, four to six months of his employment. Mr. Johnson has made no claim of anything that occurred in that last four to six months that he claims was racial, or that was retaliatory. He doesn't identify any event that happened. What happened is he was called in this meeting in September to discuss his attendance. At that point, he decided he's not going to work there anymore, so he quits. But we know the burden to establish a constructive discharge claim is greater than that required to establish a hostile environment. It requires greater severity or greater pervasiveness than the minimum required to establish a hostile environment. We know it has to be conduct that's so intolerable that a reasonable employee would feel compelled to resign. And I just refer to the Stobie v. Hattiesburg case that sets forth that standard, among others. That evidence simply was not in the record here. There was nothing that couldn't tie his decision to quit in late September to anything that had happened. If he's going back to February, that's a huge temporal disconnect there. And there was no other incidence of alleged racial harassment that led up to his spur-of-the-moment decision in this meeting in which he decided he was not going to work there anymore. So we believe, even without regard to the exhaustion argument, we simply believe that the evidence does not establish the constructive discharge. I do want to say about the constructive or about the exhaustion argument very briefly and understand with respect to 1981, that's a different issue. And I agree that there's not an administrative procedure requirement or an Title VII. And in the pleadings that Mr. Johnson filed in his lawsuit, he specifically says that his constructive discharge was the result of race discrimination and retaliation. That's in the record at page 21. This court has held that the Gupta exception does not apply to claims in which both discrimination and retaliation are alleged. And that's important here because the EEOC charge had already been dismissed at the time Mr. Johnson decided to terminate his employment, decided to quit. So there was nothing, it couldn't be piggybacked on. The EEOC could not have investigated at that point in time because it had no pending charge before it. And that's one of the reasons we have this exhaustion requirement is to give the EEOC that opportunity to investigate and to conciliate. And they didn't have that opportunity here because he did not file a charge with respect to that point. And finally, I did want to point out, I cited this in my letter brief and I wanted to correct this. On page two, I cite to the point where Mr. Palomares had transferred out of the department and no longer worked. And I cite it as the record at 13940. I mis-cited that. I was citing the deposition pages themselves instead of the record pages. The record pages are 878 through 879. I just wanted to clarify that. And I thank you very much. Thank you. Mr. DeFalcone, you have five minutes on the button. Can you please tell us what claims you think need to be remanded? Yes, Judge Elrod. I think all four claims need to be remanded. I think that, I submit that the McDonnell-Douglas framework as to the claims that that applies, that is failure to promote constructive discharge and retaliation. However, on harassment, we would submit that this should be remanded with an instruction that the harassment claim can go to trial. There is nothing further for this court to consider, and we would, excuse me, for the district court to consider, and we would submit that this court should correct the district court's holding and find that there is a fact dispute and plenty of evidence to demonstrate that this is, in fact, a question for a jury at trial. But are you saying that's some sort of limited remand? I don't understand why you're saying remand to apply the McDonnell-Douglas factors. Isn't it just a remand and the district court needs, if you think they need to, the district court needed to apply the McDonnell-Douglas, we point out that that's applicable and they do further proceedings. We don't say we're remanding just for this or for trial on this. We don't do that, do we? Judge Elrod, to the extent you've stated it much better than me, and clearly with much more experience, that is exactly what we're asking for here. It's just simply a remand for the court, you know, because it hasn't addressed numerous issues. What about constructive discharge, though? Because it seems to be that he made a decision to leave his job on his own. Your Honor, that we would argue is there's a dispute of material fact there because, in fact, Johnson states that the reason why he left was because of the harassment. That is actually in the paperwork that he submitted stating that he was leaving, which he admits that he did not write, and he states that he signed the paperwork in order to get his final paycheck. We would submit that there is the evidence that Pride attempts to offer for legitimate non-discriminatory reasons for why he resigned are, in fact, simply pretext for the harassment that he experienced. Judge Costa, I want to quickly address your point and as demonstrated in his pleading below, ROA 23, and as found by the district court, ROA 1387, Johnson did, in fact, bring claims according to Title VII. We have not abandoned that point. That was merely an error in the letter brief. I apologize. What does that get him that Section 1981 doesn't? Because if you're having to deal with an exhaustion problem on the Title VII with constructive discharge and retaliation, why not go the easier route of 1981? Your Honor, I can't revisit what the judge below did, and frankly, I haven't looked into the different remedies, merely looking at this from the standpoint of whether it should be reversed. On that point, Your Honor, we would argue that Gupta applies to the constructive discharge claim. There is no need for analyzing the dispute that my opponents and the amicus have pointed out here about whether this is a discriminatory constructive discharge or constructive discharge that Johnson alleges arises from the facts of the EEOC charge. He alleges no other or no additional harassment, and therefore, the only additional fact that Johnson relies on is the fact that he resigned. That is exactly the issue that was before the court in Gupta when it held that for policy reasons, there is no need for the EEOC to re-review, and for practical reasons, we don't want to erect a barrier that will keep people from filing charges. Finally, I'd like to point out on the harassment claims. Judge Elrod, in the record ROA 799, Johnson testified, and I quote, there were other times that I just heard, insert, the use of mayate, but I just heard him say it other times. There was other times you'd hear the word, it would just stand out. Clearly, there were multiple instances of the use of the in addition to the two specific instances that he discusses. Additionally, Your Honor, it is incredible that Pride says that the word could be used as a term of endearment when considering all the evidence in favor of Johnson, and I would point out that Pride offers no evidence of the fact that this term was used as a term of endearment. Rather, they rely on the translation in that it could be used as a term of endearment. They never point out any evidence that Palomar meant to use it as a term of endearment. Finally, my opposing counsel stated that there was no evidence that any of this ever happened. Your Honor, Johnson testified in his deposition that Palomar singled him out because he had a, and I quote, personal problem with Johnson, hid his promotional paperwork, sabotaged his work equipment, and singled him out and monitored him. This evidence has to be considered in the light most favorable to Johnson, but non-moving in this case. And if all of this evidence combines to demonstrate that Johnson experienced a hostile work environment giving rise to his claims, we respectfully submit that the district court should be reversed and remanded on all four claims. Thank you. Thank you, sir. I guess that's the end of the argument in this case. This case will be submitted.